FRANK STACY, Appellant, v. BROWN-HURLEY HARDWARE COMPANY et al., Appellees.

**ASSIGNMENT FOR BENEFIT OF CREDITORS: Trust Agreement**
1 —Sufficiency of Evidence. Evidence reviewed, and *held* insufficient to show that the assignee of a debtor had agreed, in consideration of the assignment, to pay absolutely the secured and unsecured creditors of the assignor.

**ASSIGNMENT FOR BENEFIT OF CREDITORS: Duty of Trustee**
2 —Accounting—Who May Enforce. A trustee or assignee receiving the property of a debtor, under an agreement to handle the same in the interest of all the creditors, the debtor not being in any wise released from his obligations, may be compelled to account for the property (a) by the debtor or (b) by the creditors.

**ASSIGNMENT FOR BENEFIT OF CREDITORS: Duty of Trustee—**
3 Mortgaged Property—Accounting. A trustee or assignee of mortgaged property of a debtor, under an agreement to handle the same in the interest of various creditors, is under no obligation to account for the property after a regular and good-faith foreclosure.

*Appeal from Polk District Court.*—W. H. McHENRY, Judge.

SATURDAY, MARCH 11, 1916.

SUIT in equity to compel defendant, which, although sued as two corporations, is but a single concern, now operating under the name of the Brown-Camp Company, to pay certain debts owed by plaintiff to third persons and to secure an accounting from defendant for the proceeds of certain property which he turned over to it under an agreement to settle and pay all of plaintiff's debts. Defendant denied any agreement to pay plaintiff's debts, but admitted that it was a creditor of plaintiff's and that it took certain property, real and personal, which was heavily incumbered, theretofore belonging to plaintiff, with an agreement and understanding that it would put a manager in charge and conserve the assets until a purchaser might be found, in the hope of raising more for plaintiff's creditors than could otherwise be done; that it advised all plaintiff's creditors of having received the property and the conditions under which it was taken, and suggested that with proper management, perhaps 50 cents on the dollar might be realized from the property after paying the mortgage upon it. It averred that it continued to operate the store which plaintiff turned over and, from time to time, made reports to him and to his creditors of the progress made; that thereafter, the holder of the mortgage upon the stock foreclosed his mortgage and the stock was sold to one McKay, the highest and best bidder, for $6,000. This amount was credited on the mortgage, leaving a balance still due and unpaid thereon of substantially $2,000, which was also a lien upon the real estate received by it from plaintiff. The estimated value of this real estate was $800, and thereafter, the mortgage upon this real estate was foreclosed and the property sold for the sum of $2,289.73, the amount of the balance due on the mortgagees' claim. They aver that they got nothing out of plaintiff's property and specifically deny that they agreed to pay his creditors or any of them anything more

than a pro rata share of whatever they received from his property over and above the mortgage incumbrances; and that, as it received nothing, it has done its full duty in the premises. On the issues joined, the trial court dismissed plaintiff's petition, and he appeals.—*Affirmed.*

*F. L. Ferris* and *Smith & O'Connor,* for appellant.

*C. F. Maxwell* and *Henry & Henry,* for appellees.

DEEMER, J.—I. Plaintiff was engaged in the hardware and implement business at the town of Manson, and also owned a lot in that town. Both were incumbered by mortgage to secure the sum of $8,000. This mortgage was made in January of the year 1909. He became deeply involved in debt, defendant being one of his creditors, its claim being approximately $1,000. Becoming apprehensive regarding its collection, defendant, a wholesale dealer in Des Moines, sent its president and an attorney to Manson, where they had an interview with plaintiff and discovered that he was on the verge of bankruptcy. A conflict arises at this point over what the agreement was, but all agree that, pursuant to some agreement, plaintiff transferred his real estate and also conveyed his stock of goods, including notes and accounts connected with the business, to the defendant company. It is claimed by plaintiff that there was a conditional agreement to the effect that an invoice should immediately be taken of the goods, notes and accounts, etc., and if it should be ascertained that there was sufficient to warrant defendant in so doing, it would take the property and not only assume and pay the mortgage indebtedness, but also take care of all of plaintiff's unsecured creditors. This agreement is denied by the president of the company and also by its attorney. At any rate, it is admitted that an invoice was taken of the personal property and that it showed something like $11,000 of personal property, and a valuation

1. ASSIGNMENT FOR BENEFIT OF CREDITORS: trust agreement: sufficiency of evidence.

of something like $1,000 to $1,200 was placed upon the real estate. It is admitted by plaintiff that there would be shrinkage on the invoice of about 10%; so that, according to his theory, defendant received about $11,000 in property. The mortgage was for $8,000, with some interest either due or accruing, and the unsecured debts, including that held by defendant, amounted to between $4,000 and $5,000. Defendant put a man in charge of the store at the time the transfers were made, and plaintiff assisted this man in making the invoice; and after the invoice was taken, the man in charge continued to run the business until it was finally taken from him and sold at foreclosure sale under the chattel mortgage. When defendant took over the store, the then mortgagees were insisting upon the payment of their debt, and defendant, before the invoice was taken, and on or about May 28, 1909, brought an action against them to restrain them from taking possession of the stock or from foreclosing their mortgage. In this petition, they averred, among other things:

"That in the event of it appearing that the value of the said stock of merchandise is sufficient to warrant this plaintiff in doing so, plaintiff purposes and intends to pay off and discharge the amount due the defendant Hicks & King under their chattel mortgage as well as the amount due the other creditors of the said Frank Stacy hereinbefore referred to, and that the plaintiff is able, ready and willing to do so in the event the said invoice, when completed, shows the said stock of merchandise to be of sufficient value to warrant the said undertaking on the part of the plaintiff."

A restraining order was issued on this petition; but on June 11, 1909, Homer Miller, at the suggestion of some of defendant's officers, purchased the mortgage and the note which it was made to secure, and took assignments thereof. Thereafter, and on February 16, 1910, Miller transferred the note to one McKay; and on April 8, 1910, he (McKay) placed this mortgage and note in the hands of the sheriff for foreclosure by notice and sale. Under regular proceedings, the

stock of goods was sold at public auction to the mortgagee, McKay, for the sum of $6,000, he being the highest and best bidder therefor. This amount was credited on the $8,000, leaving approximately $2,000 due thereon. Thereafter, and on May 18, 1910, an action was commenced by McKay to foreclose the mortgage on the real estate (the mortgage covering both real and personal estate) for the balance remaining due on the $8,000 note; and after regular proceedings, this property was sold at public auction to McKay, the highest and best bidder, for $2,289.73. This extinguished, as we understand it, the mortgage indebtedness. It is not shown what has become of the property since McKay bought it in at sheriff's sale. Plaintiff and his wife made answer to the petition in the foreclosure action, but that answer does not seem to be in this record. Defendant has never realized anything out of the stock upon its unsecured claim, and has not paid any of the other unsecured creditors. It became apparent in June, 1910, that it could not do so, and on June 17th of that year, it rendered to plaintiff and to each and all of his creditors a statement of its account, showing what had been done with the property in its hands and the proceeds thereof, which statement closed as follows:

"We regret our inability to realize something for ourselves and other unsecured creditors, but we always like to be satisfied nothing can be obtained before submitting to a loss, and therefore do not complain of our additional loss of time and money in trying out this trusteeship, as we expect other houses to use the same effort in similar cases in their territory where we are interested."

This action was commenced in April of the year 1914, nearly four years after this final statement was mailed out. Almost immediately after the invoice was taken, defendant mailed out a statement to plaintiff and to each of his creditors, advising them of the bill of sale and deed taken by it and stating the conditions as they found them before and after the inventory was taken, and concluding as follows:

"Some goods have been invoiced which are not worth the inventory price. We have also ascertained that some of the goods invoiced are not paid for and were delivered on consignment. Without taking any of these things into consideration, the inventory amounts to $11,060.15. If the stock is managed in a business-like manner, there will not be over a 10 per cent shrinkage in the stock. The real estate which was taken over was invoiced to Frank Stacy at $2,500.00. We have been offered $750.00. The real estate ought to bring from $1,000.00 to $1,200.00. We have a good man in charge of this stock and expect to continue his services for the benefit of all creditors. If there is no further indebtedness than the present list of creditors appearing against this stock, we should realize about 50c on the dollar. If your claim is not already filed with me, do so at once."

Pursuant to this, practically all the creditors sent their claims to defendant; and under date of March 8, 1910, it mailed another statement to plaintiff and his creditors, containing a cash account and a statement of liabilities. This showed a balance of $226.10 in cash, but an excess of liabilities over assets of something over $2,500. The statement also contained the following:

"The present holder of the mortgage is now insisting upon payment by April 1st, in default of which he will foreclose. The impossibility of meeting his demand is apparent. It is also indefinite as to when creditors will realize anything, if at all. It seems to us the only thing to do is for all general creditors to get the 'booster spirit' and try and sell this stock on or before April 1st for the highest amount of cash obtainable and quit trying to get blood out of a turnip. . . . The present mortgagee has agreed to a private sale if he is first to be paid out of the proceeds. It has occurred to us also that if a buyer for this stock cannot be obtained by April 1st, it might not be bad for us to consent that the mortgagee sell it at private sale for the highest amount of cash obtainable,

pay his claim first, and then pay us a reasonable compensation for the time we have given in an effort to liquidate this business, and then pro rate the balance of money to general unsecured creditors, if there is any balance. With this thought in view we have instructed Mr. Ford, the manager of this store, to show all cash customers over the property, and we would be pleased to hear from you as to any better and cheaper method of liquidating this business that may occur to you that would enable us as general creditors to realize something upon our respective claims."

To the same parties, it sent another statement under date of April 15, 1910. In this, it advised of the foreclosure proceedings, of an arrangement to keep the store open and running during the proceedings, and then stated:

"Our intention is to be present and boost the bids· to .somewhere near the value of the stock and protect creditors if possible in that manner. Frankly, the unsecured creditors will realize little, if anything. It looks as though our firm has spent its efforts in this case without reward, save the satisfaction of knowing we could not get blood out of a turnip. Efforts to sell the stock have resulted in nothing. Such prospects as we have obtained could not finance the deal."

This was followed by a final statement, of date June 17, 1910, from which we have already quoted. The bill of sale and deed to which we have referred as covering the goods and real estate were in the ordinary form of such instruments, and contained no recitations which throw any light on the controversy. In writing a letter to an attorney for plaintiff, who had an unsecured claim against plaintiff, defendant said:

"Permit us to call your attention to the last paragraph of your letter reading as follows: 'I see no reason why an adjustment of these claims cannot be had.' We wish to state that we thought you were better informed in regard to the Frank Stacy matter, knowing full well that we took the stock over for the benefit of creditors. They will all share alike,

but we have an elephant on our hands, so to speak. If we could find a buyer for the stock in its present condition, we would gladly unload it."

Again writing him, under date of September 22, 1909, they said:

"Have your clients verify their claims and the proper record will be made, so that they will share in the final distribution."

Shortly after defendant took over the stock, and on June 12, 1909, its attorney wrote plaintiff a letter, from which we quote as follows:

"I expect to keep every promise that I made to you concerning this or any other matter. The footings of the inventory have not been finally completed, but have progressed far enough that Mr. Brown has decided to get some of his friends to take an assignment of the mortgage from Messrs. Hicks and King so that it cannot interfere with our arrangement. We have accordingly sent the money to the Calhoun County Bank to take up this mortgage and the notes. Mr. Hicks was in town yesterday and our arrangement has been entirely satisfactory to him.

"You asked to know what Brown-Hurley Hardware Co. intends to do, and I will say that they intend to do just what I advised you they would do, viz.: that if there was enough merchandise in your store to warrant them in so doing, they would have some of their friends buy this mortgage from Hicks and King so that they could not foreclose it, and then they would continue to operate the store with Mr. Earhart or some other man as manager, and from the profits derived from operating the store pay off the mortgage and the unsecured creditors as fast as they could do so. I thought I made this matter plain to you while up there and that both yourself and the Calhoun County Bank understood what our arrangement was. Certainly we have progressed far enough by this time to satisfy you that we are working in that direction. If I have not made the matter clear to you, I would be

pleased to hear from you further as I want you to understand clearly our position and at the same time to understand that Brown-Hurley Hardware Co. is not trying to change the position from that represented to you by me while at Manson.''

On July 26, 1909, plaintiff wrote defendant, complaining that the man in charge of the stock would not sell some goods to a proposed purchaser, and concluding as follows:

''Now I am not writing this letter to meddle with your business, but in fairness to my creditors, I think Mr. Ayhart should try and make a sale of this second hand engine if he could, at least should know that it is in the stock. I also wish to call your attention to the fact that Ayhart is absent from the store a great deal of the time. In fact, he has been gone since Saturday afternoon about 3 o'clock and has not yet returned Monday afternoon. That he has been using the time that my creditors will have to pay for in learning to run his auto. That the 17-year-old boy John Jansen is in charge of this business at least one half of the time. That Mr. Ayhart has a boy here who is allowed behind the counters and has free access to the money drawer. Now I do not say that there is anything wrong in this, but I do say that it may not be fair to all parties concerned. There are others who are interested in the running of this business and I want to see it run so as to pay out the creditors. Now I hope you will understand that the only object I have in calling your attention to this is for the good of all parties concerned and that I am thoroughly impressed with the fact that the man from Dedham is a great success and will probably work this out all right without any of my help.''

Responding to this, defendant said, in part:

''It was a bad mess, to say the least, and we do not propose to put in our good hard cash and see the same vanish on account of poor management. When we are convinced that Mr. Ayhart is not the right man for the place, we will look elsewhere for the proper material.''

Plaintiff then wrote, under date of July 30, 1909:

"Were you surprised that I should take an interest in the running of our store at Manson in view of the fact that I turned this property over to you peaceably without any expense to you because of the representation of your attorney that the stock was to be run in the interest of all of my creditors and not be appropriated to the use of Brown-Hurley alone, to the purpose that my debts might be paid and that I should not be compelled to take the bankruptcy law. My former letter seems to have caused your temper to rise and have caused you to show your true intentions. Perhaps you know that I can still throw this into court and let court expenses eat up what little there is left, and if I am to be thrown into bankruptcy anyway, I do not know but what I may as well do it now as any time, for I do not want judgments hanging over me all the rest of my life."

These matters are quoted in order that all the written and documentary testimony in the case may be fully understood, and as foreshadowing defendant's contention. It expressly and unequivocally denies that it ever at any time agreed to pay plaintiff's secured or unsecured creditors absolutely, as claimed by the plaintiff, and insists that the only agreement it ever made was to take over the stock as a trustee, in the hope that, by prudent management, it might be made to yield something for the unsecured as well as the secured creditors, and that all it ever undertook to do was to handle it with that end in view; that the mortgage indebtedness had to be first paid in order that anything might be available to the unsecured creditors; and that, in the event it could, within a reasonable time, realize enough to pay off the mortgage and have anything left, it agreed to make a pro rata distribution of this overplus among the unsecured creditors; that, with the best management on its part, it could not be made to yield a surplus; and that, since it has accounted for all that came into its hands, there is no liability on its part. It agrees that it induced a friend to take up the mortgage in order that it might have time to make a favorable disposition

of the stock, and it also concedes that, having made a failure in this, it did not further resist the foreclosure of the mortgage, and insists that these foreclosures were regular and fair, and that it is under no further liability. A square issue of fact is presented, and the trial court found for the defendant on that issue.

We have gone over the record with care, and discover no reason for disturbing this finding. True, the numerical weight of the testimony seems to be with the plaintiff—that is to say, several witnesses testified directly in accord with plaintiff's contention; but they were all, or nearly all, interested in the result of the case or in sustaining the claim. On the other hand, the two witnesses for defendant who were present when the arrangements were made, testified directly to the contrary. True, these witnesses were also interested, but not to the same extent as were plaintiff and his wife. The conduct of the parties after the deal was concluded supports the defendant's theory of the case, and this view is the more reasonable. It is difficult to understand how good business men could be induced to enter into such a contract as the plaintiff claims the defendant did make. The only thing which militates against defendant is the statement in the petition drawn by its attorney in the original injunction suit, which we have already quoted. This attorney said, however, that it was drawn in a hurry and without time for reflection, and that, taking the instrument as a whole, it does not amount to an admission against his client. The case was entitled "Brown-Hurley Hardware Co. on behalf of themselves and others in a like situation v. Hicks & King." This indicates that the action was for the benefit of other creditors, as well as themselves. Other allegations indicated that they were at that time holding the stock not for themselves alone, but for others. Remembering that the trial court had all the witnesses before it, and that its opinion is of some weight, we are constrained to hold that plaintiff failed to make out a case on the first count of its petition.

II. The second count is said to be for an accounting on defendant's own theory, and that it has not shown that it fairly disposed of the goods. Such an accounting was made down to the time of the sale of the real and personal estate under foreclosure sales, and the only question in the case is whether or not, under the record, it should also account for the property after the foreclosure sales.

2. ASSIGNMENT FOR BENEFIT OF CREDITORS: duty of trustee: accounting: who may enforce.

The trial court seemed to think that no such issue was tendered, and if it had been, that plaintiff was not entitled to recover in any event. This latter view was upon the theory that, if defendant was a trustee and accountable to plaintiff's creditors, they and they alone may demand an accounting. We doubt this proposition. These creditors were not parties to the contract between plaintiff and defendant; and, no matter what its nature, whilst they might have sued upon it in an action at law, if as plaintiff claims it to have been, or brought defendant into court in an equity suit, if the contract was as it claims, yet they were not bound to do either. Plaintiff is still responsible to them; and if defendant failed in its duty and did not use plaintiff's property according to the agreement, he may recover either on the theory of a breach of contract or by compelling defendant to account for his goods and property. Defendant did not plead that these creditors accepted the provisions of the trust or that they waived their claims against the plaintiff, and there is no showing that he (plaintiff) has been released from any of their claims.

We are in much doubt about whether plaintiff tenders an issue based upon defendant's theory of the case which would call for any further accounting than it made. But if he did so plead as to make this an issue, we have to say that the evidence does not show that defendant agreed to take up and pay the mortgage in-

3. ASSIGNMENT FOR BENEFIT OF CREDITORS: duty of trustee: mortgaged property: accounting.

debtedness in full or in any other way. It knew, of course, that it had to be paid and that it had priority over any other claim. It did not agree that the holders of the secured claims should pro rate with the unsecured creditors. As to the mortgage, it simply took the property subject thereto. It did induce Miller to take up the mortgage, and doubtless was back of McKay in the assignment to him and in the foreclosure proceedings; but this was done primarily, as the record shows, to give it a chance to work out something for the unsecured creditors. After having secured this chance by inducing a friend to take up the mortgage, it concluded that the matter could not be made to work out; and in advance of the foreclosure, it gave notice, not only to plaintiff, but to all of his unsecured creditors, of the exact situation, and asked them for further suggestions. The sales of the property were with due notice and at public auction, and no fraud of any kind is pleaded or suggested. The mere fact, then, that the mortgages were taken up by a friend to hold for a time, in order to see whether or not the property could be so manipulated as to secure something for the unsecured creditors, should not be regarded as a circumstance against the good faith of the transaction. These matters were fully pleaded in defendant's answer, and plaintiff made no reply thereto, save a general denial. If the foreclosure proceedings had been by the original mortgagee, no one would contend that defendant should be held to account after a regular foreclosure sale. This being true, a foreclosure by a friend of the defendant, in the absence of fraud, is just as much a defense as if it had been made by an adversary. There is no claim in the pleadings and no testimony that these foreclosures were collusive, or that defendant had any profit therefrom. Adopting the wrong theory, the trial court erroneously sustained some objections to testimony offered by plaintiff; but for reasons already suggested, this testimony, so far as offered, even if admitted, would not affect the real merits of the case. We

reach the conclusion that the decree below is correct, and it must be and it is—*Affirmed*.

EVANS, C. J., WEAVER and PRESTON, JJ., concur.